et al. Mr. Moore for the Petitioner, Ms. Theobald for the Respondent. May it please the Court, I have reserved two minutes for rebuttal. This case is a case that involves the extension of the Mine Act to what is clearly not a traditional mining entity. DQ Fire and Explosion are experts. They are consulting on this. They were hired by one of Performance Coal's law firms. What is your argument? They have to have some relation to the extraction process? Is that your argument? Yes, that's part of the argument. Your Honor, can you help me on the question of haven't we decided this already? Otis Elevator, then Judge Thomas, squarely rejected that argument, didn't he? He rejected that argument, Your Honor, but the question is how far are you going to go? Well, he said, let me just read you a couple provisions and it seems pretty clear how far we're going to go, because this is a panel and we're governed by the previous panel. In this case, the Commission concluded that not all independent contractors who perform services at mines are operators under the Mine Act. The Secretary disagrees, having promulgated regulations stating that any italicized person who contracts to perform services at a mine is an operator. For the reasons set forth below, we think the Secretary's reading is the correct one. Well, Your Honor, if you look at footnote 3 in that decision, then Judge Thomas said there would be situations where there may be de minimis contacts. And I don't believe de minimis is a matter of time, but in terms of what they actually are doing. Well, we rejected the argument, specifically rejected the argument that it had to be related to the extraction process.  So now we're only on the meaning of de minimis? Is that the question? De minimis and how far you go, because here's the situation. When Congress passed this provision, all they were thinking about was independent contractors who did construction or who did things related to extraction. And that came from some legislative history. Yes. Which we expressly rejected in the case as being sufficient to decide the case, right? The Senate report did say that. Judge Thomas did reject that. Yeah. But I think if you look at the collection of cases, both here, the Fourth Circuit, Joy Technologies. We rejected the Fourth Circuit's view. I understand. Keep in mind here, the three of us are completely bound by Otis. We can't decide it's wrong or misread the legislative history or anything. I don't think Otis binds you here, Your Honor, because of footnote 3. I see. Now, in Otis, they didn't give deference to the agency, right? Because at that point, the court hadn't decided whether we give Chevron deference to jurisdictional determinations. That's correct. The Supreme Court has now said we do. That is correct. So whatever Otis decides, that's only—we have to go even further. Now we have to defer to the agency unless it's unreasonable. Well, what are we deferring to here? We're deferring to the meaning of the words, any person. But we're deferring to the agency in a litigation position here. Not just here. In every single case that they've taken, and in this case it's before—it's a position— I don't know. We've already decided that we, in Kenilton and about eight other cases involving MSHA, that we have to defer to the position they take in adjudications before the MSHRAC, right? Well, the problem we have here, Your Honor, is this case, in a sense, is sui generis. Because while Otis—they were doing something that the miners in the mine were involved with, riding the elevator every day. Same with Joy Technologies. In this case, we don't have—we have a mine that's essentially shut down. It's MSHRAC-controlled. And we have an entity that their sole purpose there is to gather information, to provide information to counsel for performance. But, Mr. Moore, I'm not sure that really helps you. Because they're gathering information on a catastrophic mine accident. And the principal purpose of the Mine Act is to protect the safety of the miners. And one of the principal purposes of investigating mine accidents is to figure out why they happen and protect the miners. So this is not just riding in the elevator. This is mining in the mine at the risk of death. Except what this particular entity is doing, what DQ is doing, is not for the purposes of additional regulations of their life. Now, whatever DQ did wouldn't sway MSHRAC from its position when it came out with its report. And so whatever DQ is doing is defensive, and in that sense is simply a defense against whatever MSHRAC comes up with. Now, that never was—DQ never issued a report, because what happened was performance as parent was bought by Alpha Natural Resources, which settled everything so they could get on with life, so to speak. But DQ isn't serving a purpose of the act. What they are doing is they're serving a purpose of defending an operator from whatever conclusion MSHRAC comes up with. I mean, even if MSHRAC is correct, they would take the opposite position and say that MSHRAC is wrong. Even if their own safety investigation discloses that MSHRAC is correct, they would come in and say, no, no, it's not true. Not necessarily. Well, not at all, I assume. If they've concluded that the mine was unsafe and they came in and said the mine is safe, they risk considerable liability, don't they, including criminal liability? Yes, they do. Yeah. And what we don't know is it was never played out in any public forum as to the opposite opinion that DQ might have. But recognize also, if MSHRAC tells you this is for the purposes of the act, it clearly isn't, because what MSHRAC was doing was trying to restrict their investigation. They were trying to keep them out of the critical area for investigation. I don't know why that's so surprising. They didn't want them to mess with the evidence. That seems either to mess with the evidence or themselves to be injured. Both of those seem to be consistent with the Mine Act. Well, except for that MSHRAC had completed its investigation. Well, that appears to be disputed. If you were right that they'd completed it, then the order would be wrong. But we're going to start with the theory that the order is correct. They advised that their investigation wasn't complete, but essentially they might perform and start doing an investigation. There is no way, based on the facts of this case, that DQ could have messed with the evidence. You have to remember what they had with them when they were underground. Let me just say, so you have to win both arguments in order to win? Is that what you're saying? Because the argument you're making now is whether the order was itself arbitrary and capricious to extend as long as it did. The other argument you opened with was an interpretation of the statute. I do not have to win both arguments. I can win either one. All right, so let's assume you're wrong on the arbitrary or capricious argument and that the order is perfectly appropriate because MSHRAC's investigation was still going on and they didn't want you to mess with the evidence. The problem with that is that you've got the modification to the order back in December, and then what you have here is three instances in one week where you have an individual from MSHRAC giving permission to go into certain areas of what is known as Zone 5. And what happened is after that week, and MSHRAC says, well, you couldn't modify it other than with a designated authorized representative of the sector. Well, Mr. Dubina, who was with this inspection team, had that appearance. But we'll back up for a second. Once we've got three instances in a week, and what did MSHRAC do? They waited until the next week. They said, well, one of them is okay, but the other two aren't. Now we have moved on to the second argument, not to the statute. Yes, we have moved on to the second argument, Your Honor. And we believe that given the fact that that order, of course, the way it was written back in December, clearly wasn't the way it was applied in the mine, and recognize that I don't know who at MSHRAC wrote the order, and the person whose name on the bottom probably wasn't the person who actually wrote the order. The absolutist language clearly wasn't what MSHRAC was applying in the mine. So if that is indeed the case, then the application of the order to result in a citation was improper because they should have excused all three because that's what they did with one of them. What you have here is, in a sense, an entrapment. MSHRAC sent somebody along with the team who was clearly asked questions if they could do things, and he said yes. And then all of a sudden, oh, no, that's wrong. Comes Friday afternoon, that's wrong. Mr. Moore, we know from our earlier decision in the performance call in 2011 that this order was modified, I think it was 60 times. Do we know whether in any of those instances there was a kind of on-the-ground oral modification, as your client asserts took place in this case? Well, I cannot tell you that. I was not on the ground with this investigation. Since I only represent DQ, I do not represent performance. So I can't speak to that. All I can do is speak to, in other investigations that I have been on the ground, things have been worked out as you went along in an investigation. This investigation seemed to be more acrimonious than most because it's the only one I ever knew to get to this court or any other court of appeals on the O.K. order as to what the scope was. And it's, frankly, the only one where I know that an expert who was retained by the operator was cited for anything. And it seems to me that we have a situation where, for whatever reason, MSHA peers have overreacted in early January and should not have issued that citation. They should simply have modified the order and said, and recognizing also they cited performance, who was the appropriate person to cite, as far as I'm concerned, that that's where it should have stopped. And one of the things is in Government Exhibit 8, which is the notes of one of the inspectors, Mr. Maggard, he said when he talked to Dr. Rezka on Thursday or Friday, he explained the K order to him. Well, if this is also clear-cut, non-modifiable by any other means, that would seem to be superfluous. But it wasn't in his mind, and he was one of the people on the ground. Okay. I think you're well into your rebuttals. Yes, I apologize. No, there's nothing to apologize about. Thank you. Any questions? We'll hear from the government. May it please the Court, my name is Molly Theobald, and I represent the Secretary of Labor. As the Court is already aware and we've already discussed this morning, this case arises out of the accident investigation at the Upper Big Branch Mine. This case consists of five issues. Four of the issues involve a 103-K order, and if the Court has no questions for me on the interpretive question of whether DQ is an operator, I will move on to those issues pertaining to the 103-K order. I don't hear any questions. I'll start with the validity of the K order. MSHA was within its discretion in maintaining the 103-K order through the January dates at issue because there were still ongoing safety risks within Zone 5, including the potential for roof fall, and because there were important pieces of evidence that had yet to be collected, including bits of the shear. Section 103-K orders are issued... What was the concern about the evidence? What was the concern about what? Why did it matter whether these experts walked around amongst the evidence? MSHA was hoping to prevent any disruption to the accident scene while MSHA was proceeding with its own investigation. MSHA's issuance of 103-K orders are reviewed under the abuse of discretion standard, and here the ALJ credited testimony from MSHA witness McElroy about the ongoing investigative activities in Zone 5 and credited Dubina's testimony, MSHA employee Dubina's testimony, regarding the safety risks. So the ALJ concluded that MSHA was within its discretion to maintain the 103-K order, and this court should affirm. I will now turn to DQ's violation of the 103-K order. There's no dispute that DQ entered Zone 5 on the dates at issue. The dispute turns on whether the 103-K order was modified, and whether the dispute turns on two competing accounts of the proper procedure for modifying the K order. MSHA presented testimony, and as did DQ, and in reviewing the record as a whole, the ALJ credited the testimony from MSHA authorized representative McElroy that the proper procedure for modifying the K order required a request by the operator at least the night before, and that MSHA deliver a modification of the K order. And do you have any insight into all those prior modifications, the several dozen? Is it always done in writing like that? Are there any examples of instances in which an authorized person from MSHA is with others in the mine and can give them on-the-fly authorization? There is no evidence in the record of that type of modification being issued like that on the ground. There is an example on page 83 of the joint appendix of a written modification of the K order. The December 23, 103-K order was itself a modification. On the next page, J84 at the bottom, it says, Any modifications to the existing investigation plan. Does that say that does not apply to DQ, or does it? I'm sorry, say that again? At the bottom of J84, the top of J84 are the words that say, No person shall be permitted in Zone 5 to conduct any activities other than for the purpose of conducting examinations required by the regulations, and DQ is not doing that, right? Correct. And that's the ground for the theory that they were not allowed to enter Zone 5. That's correct, Your Honor. On the bottom, it says on the same page, Any modifications to the existing investigation plan shall be submitted to MSHA's accident investigation team. What is that? Is that the provision where you're saying it explains how modifications should be done, or is that about something different? Well, the ALJ relied on testimony from McElroy to find the proper procedure for the modification. But it's not otherwise written anywhere how to modify it? No, Your Honor. So this paragraph at the bottom doesn't apply to this situation? This wouldn't be a modification of the existing investigation plan? I understand your question. This is a modification to the investigation plan. No, to Performance Cole's investigation. So they were required already to provide updates and changes to their investigation plan in general. So this doesn't have to do with modifying the K order so that they can enter Zone 5. Oh, it doesn't. It doesn't. I thought it didn't, since nobody addressed my attention to it. The investigation could change, and the investigation involved more areas than just Zone 5. And because this is a dangerous situation, a post-accident scene or post-accident mine, MSHA and Performance Cole were communicating constantly about where teams were going each day so they could track where people were in the mine, whether or not they were in Zone 5. So this may be just a small point, but I just want to be clear. The part at the top that says no person shall be permitted to conduct any activities other than for the purpose of conducting examinations, was Performance Cole conducting activities for the purpose of conducting examinations? No, they were not. They testified that they were not. So at the bottom, when it says any modifications to the existing investigation plan, is this overall this requirement that no one can go into Zone 5 unless they're conducting examinations? This reference to modifications at the bottom, is that about how you would go about modifying the provision about Zone 5, or it's just totally unrelated? It's unrelated because, and this is part of what the ALJ was pointing to when he said that DQ was conflating the procedures for complying with the stipulation of the December 23rd K Order with procedures for modifying the December 23rd 103 K Order. So there are stipulations requiring that there's an ongoing investigation plan within the mine, and this merely reads to say that the investigative activities would need to be communicated to MSHA. Can you tell me how you get high negligence on the fact that no one should have known? Given the odd circumstances, and the Commission's understanding that there was some confusion, there was confusion initially, why wouldn't the confusion continue? And so how do you get one date modified and not the other two? And frankly, it looks like the Commission mischaracterized the ALJ's finding, January 12th, to make it sound other than what it was. In other words, how do you get high negligence on a situation like this? If someone is being misled, obviously, the Commission seems to accept that, that they changed one date. There were no mitigating circumstances because first the ALJ found that there were no informal procedures as offered by DQ, and that DQ did not follow the informal procedures that it proposed were in existence. And the ALJ held that DQ did not follow those procedures.  The point is there was potential innocence here or being misled because of following an agency person into the mine? MSHA looked at the circumstances on the 10th and on the 11th and 12th and did, in fact, distinguish between the events that took place on the 10th and the events that took place on the 11th and 12th. So on the 10th, Dubina, while the investigative team was already in Zone 5, said okay when DQ, members of the DQ investigative team, asked to look out further at the shear. On the 11th and 12th, Dubina testified that he did not grant permission. And the ALJ, looking at the record, found that those were, the circumstances were different and that even if DQ thought that these informal procedures were in place, they had failed to follow them. The point is the ALJ appeared to credit Dubina's testimony that Dubina did not recall granting permission to enter Zone 5. But the characterization of what the ALJ says seems to be wrong. The ALJ says on January 12, the witness testified that he asked Dubina whether the team could proceed to Zone 5 and Dubina responded, I don't see a problem with that. Dubina did not recall this conversation but admitted under cross-examination that the turn of phrase was not untypical of him. Now I don't know how you get from that that Dubina denied that he even granted permission. That's a heck of a leap, especially when the standard is high negligence. The ALJ, inciting to that, in the paragraph where he found that DQ had not followed its own procedures, considered Dubina's testimony to be credible. Yeah, but Dubina didn't say anything that's helpful to the commission with respect to the fault there. He's just saying Dubina didn't recall but admitted under cross-examination that this phrase that was attributed to him was not untypical. So I mean, I don't know where that puts us. In the record, Dubina does testify that he did not grant permission for DQ to enter Zone 5 on the 11th or the 12th. Further questions? No. Okay, thank you very much. Thank you very much. How many minutes left, if any? Okay, we'll give you two minutes. Thank you. Let me be brief. The informal procedures for modification that we talked about were actually to be done by performance. They were to make the telephone call to MSHA and they were to send the email. It's not DQ failing to do that. The order was issued to performance and it's performance's responsibility, not DQ's. That's the first thing. Second thing is, if in fact Mr. Dubina said that he didn't grant permission on the 11th and 12th, he behaved rather oddly. He went along. He didn't call out. There were phones available. He didn't call out or do anything like that. He just went along and he didn't say, no, you can't do this. Because if he'd said that, both Dr. Reska and Danny Laverty from performance would have stopped. Well, I take it that that wasn't his job, right? The government's position is he is a different kind of person. He doesn't have the authority to do that. He never told the people on that inspection. Well, he says that they had reason to know by the 11th that he did not have authority. And he gave no reason why they had reason to know. And he behaved on those days as if he had that authority. The ALJ found him not credible. Found your guy not credible. On that, yes, he did, Your Honor. But the thing is, take Mr. Dubinis' testimony by itself. What he's saying is he didn't give permission, but he went along. Mr. Moore, this is a highly professional outfit, presumably DQ. And they're coming in as experts in a really serious mine accident. And I guess the MSHA position, as I understand it, is that it is the affirmative obligation of performance and DQ to know the ropes. And there's a lot of intuitive appeal to your position that they're there. Somebody who's wearing an MSHA hat says yes. But I think their supervening position is, you know, we require more sort of chapter and verse knowledge of lines of authority than that. And I'd be curious about your response to that. Well, Your Honor, DQ are professional scientists. They're not coal miners. And every time they went underground, performance assigned an individual with them who was a professional coal miner. DQ was there to gather scientific evidence. MSHA's presumption that they should know the ins and outs of the Mine Act is, I believe, simply that, a presumption that has, we all know, basis in fact. There were lots of people with this group underground, all of whom were experienced miners. And yet we have Mr. Dubita, who's a very experienced MSHA guy. He's been there throughout the investigation. And all of a sudden, he doesn't have the authority. So I think that while MSHA would like to make us, you know, assumptions, presumptions about what DQ should know, they, you know, when they issued that K modification, they issued it to performance. That's not issued to DQ. MSHA thought it was, that they might not even know about it. And on Inspector Maggar's notes, he said, I showed him the 103K modification. So I think that what MSHA thinks is, I think, frankly, a parochial view. They're not used to dealing with people who are true fire and explosion experts. I'll make one final comment. I know I'm out of time. In terms of disturbing sites, if you look at page JA86, it spells out all the things performance has to do when they are underground and reports, photos, and all of the like. And if they pick up anything, they've got to report it to MSHA and all of that. So I don't think there's actual concern about disturbing a site. The last thing is, the examinations that are referred to, they are what's known as pre-shift examinations. They were being done once of the entire mine, three times a day. And they were done by certified mine examiners. That's what they're talking about. And so when we're talking about safety, we're talking about a mine that nothing is going on but is ventilated, is examined. And, yes, solicitor mentioned roof falls. That's not specific to post-explosion problems. And, frankly, in terms of tests and things like that, if MSHA did tests, they'd all be there and everybody would be watching them, including the people from performance. So no further questions. Thank you. All right. We'll take a matter under submission. Thank you both.
judges: Garland, Pillard, Edwards